## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## TERRE HAUTE DIVISION

| | | |
|---|---|---|
| EFREN MENDOZA-VARGAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 2:16-cv-0048-WTL-MJD |
| | ) | |
| DR. SAMUEL J. BYRD, | ) | |
| ROBIN L. KNUST, R.N. | ) | |
| | ) | |
| Defendants. | ) | |

**Entry Denying in Part and Granting in Part Defendants' Motion for Summary Judgment and Directing Further Proceedings**

### I. Background

Plaintiff Efren Mendoza-Vargas ("Mr. Mendoza") is an inmate in the custody of the Indiana Department of Correction ("IDOC") at the Wabash Valley Correctional Facility ("Wabash Valley"). His amended civil rights complaint brought under 42 U.S.C. § 1983 alleges that defendants Dr. Samuel Byrd and Robin Knust, R.N. acted with deliberate indifference to Mr. Mendoza's facial injury that occurred while he was playing soccer. He seeks compensatory and punitive damages.

The defendants seek resolution of the plaintiff's claims through summary judgment. Mr. Mendoza has opposed the motion, defendants replied, and Mr. Mendoza filed a surreply. The motion is ripe for resolution. For the reasons explained in this Entry, the defendants' motion for summary judgment, [Dkt. 38], is **denied in part and granted in part.**

## II. Summary Judgment Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp*., 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris,* 550 U.S. 372, 380 (2007).

## III. Discussion

### A. Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Mendoza as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000).

Mr. Mendoza is from Mexico and has an average education level of 4th-5th grade. Spanish is his primary language and he struggles with English. He has received help from another inmate in litigating this case. Dkt. 46-1, (Declaration of Mendoza), p. 14, ¶¶ 4-5, p. 22, ¶ 3.

On September 27, 2015, Mr. Mendoza collided with another inmate while playing soccer. He was knocked unconscious and suffered an injury to the area below his right eye. After he woke up, he walked to the Wabash Valley clinic with assistance from the other inmate involved in the collision, and another inmate. Both injured inmates were seen by Robin Knust, R.N. ("Nurse Knust"). Mr. Mendoza was bleeding from a cut to the orbital area below his right eye. Dkt. 39-3, (Declaration of Robin Knust, R.N.), ¶ 6; Dkt. 39-2, (Medical Records), pp. 30-31; Dkt. 16, (Amended Compl.), pp. 3-4.

Nurse Knust cleaned and dried the affected area on Mr. Mendoza's cheek and applied ice to reduce potential swelling. The bleeding from the injury to his cheek stopped when Nurse Knust applied pressure. Nurse Knust then applied steri-strips to close the cheek laceration. She also applied a band-aid to a small cut above Mr. Mendoza's eyebrow. She gave Mr. Mendoza cool compresses to control swelling in the area of his injury.

As Mr. Mendoza's injury occurred on a Sunday afternoon, there was no physician on site at the facility. During her examination, Nurse Knust telephoned Dr. Samuel Byrd who was the physician on call that day. She described the injury to Dr. Byrd and her assessment of Mr. Mendoza's physical condition. Dr. Byrd entered an order to start Mr. Mendoza on an antibiotic (Keflex) and requested that Mr. Mendoza be seen by him for a follow-up evaluation the next day.

Nurse Knust's examination and treatment of Mr. Mendoza on September 27, 2015, was the extent of her involvement in his medical care. Dkt. 39-3, ¶¶ 6, 7. During the examination, Mr. Mendoza was conscious, responsive and cooperative with the treatment the nurse provided.

Nurse Knust did not rule out a possible concussion or the possible need for sutures to close the cheek wound. *Id.* at ¶ 7. The medical chart reflects that Nurse Knust made a referral to Dr. Byrd. Dkt. 39-2, p. 31.

Mr. Mendoza states in his sworn declaration that he told Nurse Knust that he could not see out of his right eye, his vision was blurry, and he had a severe headache. Dkt. 46-1, pp. 15-16, ¶ 10. Nurse Knust states in her sworn declaration that there was no indication that he was unable to see out of his right eye and that Mr. Mendoza did not report symptoms such as "nausea, double vision, severe head pain or other neurological symptoms associated with possible traumatic brain injury, including a concussion." Dkt. 39-3, ¶¶ 7, 9. She stated that if he had, she would have reported the symptoms to the provider on call for further evaluation. *Id.* She stated Mr. Mendoza did not report further symptoms until the next day when he saw Dr. Byrd.

The parties also dispute whether Nurse Knust said when she looked up Mr. Mendoza's information on the computer, "He's Mexican. I'm not going to touch that." Dkt. 46-1, p. 16, ¶ 16; dkt. 39-3, ¶ 8. The parties agree, however, that Nurse Knust did touch Mr. Mendoza in the course of treating his facial injury.

Mr. Mendoza states that Nurse Knust saw both him and the other inmate with whom he collided, Mr. Santiago, and that she told both of them that they would have to get stitches off-site. Dkt. 46-1, p. 16, ¶¶ 12-15. Mr. Mendoza also states that she told Mr. Santiago that he would have to shave his head to receive stitches. Mr. Santiago did not want to shave his head so he declined to go off-site. *Id.* Mr. Mendoza states that he wanted to be sent off-site but a correctional officer told the offenders that if they did not both go, neither would go. Nurse Knust does not discuss these contentions in her declaration, so they are undisputed.

When Mr. Mendoza went back to his cell, he experienced extreme pain, he felt dizzy, and had trouble walking. Dkt. 46-1, pp. 16-17, ¶¶ 17-20. The pain was so severe that night that he had trouble sleeping. He was spitting blood and blood came out of his nose when he blew his nose. *Id.* at p. 18, ¶ 22.

Nurse Knust was not responsible for scheduling provider appointments, but the next day, September 28, 2015, Dr. Byrd saw Mr. Mendoza for a follow-up assessment. Dkt. 39-2, p. 26. Dr. Byrd observed that Mr. Mendoza had a 4.5 cm. (1.7 inch) linear laceration on his right cheek. *Id.* at p. 29. The cheek laceration reflected excellent closure with steri-strips. *Id.* at p. 26. During this visit, Mr. Mendoza reported that he may have lost consciousness briefly after the collision with another inmate and he had "felt out of sorts" since the injury. *Id.* Mr. Mendoza reported symptoms of headache, bruising, and pain around his right eye and cheek, all of which Dr. Byrd states are typical for the type of injury he suffered. Dkt. 39-1, ¶ 6.

Based on Mr. Mendoza's reported symptoms, Dr. Byrd confirmed that Mr. Mendoza was not experiencing nausea, vomiting, vertigo, focal neurologic complaints (such as double vision, slurred speech, facial drooping, numbness or difficulty walking), or any other signs of potential brain injury. *Id.* at ¶¶ 5-6.  Dr. Byrd prescribed Tylenol for pain ("[h]e has been started on Tylenol for pain relief"), and an x-ray of Mr. Mendoza's facial bones. *Id.* at ¶ 6; dkt. 39-2, p. 26. The medical report stated, "no opiate medication to be given as we must know if his mental status becomes altered." Dkt. 39-2, p. 26. "Given bruising and bleeding, NSAIDS were not ordered as they may exacerbate this." *Id.* Based on Dr. Byrd's physical examination of Mr. Mendoza and review of his symptoms, Dr. Byrd did not believe that diagnostic imaging in the form of a CAT scan or MRI was clinically indicated at that time. Dkt. 39-1, ¶ 6. Dr. Byrd told

Mr. Mendoza, "it's too late for stitches and you'll be fine." Dkt. 16, ¶ 30; dkt. 46-1, p, 18, ¶ 26; dkt. 46-1, p. 33, ¶ 9.

On September 29, 2015, Mr. Mendoza submitted a Health Care Request Form ("HCRF") stating that he was experiencing extreme pain and a bone-crunching sound when eating. He reported that his eye was swollen and his vision was impaired. He believed a bone was broken and requested an x-ray. Dkt. 39-2, p. 44.

On October 1, 2015, Mr. Mendoza was seen by Barbara Briggs, R.N. Nurse Briggs examined Mr. Mendoza and noted that his right cheek and eye continued to be swollen and bruised. He reported that it was painful to chew and that he was spitting up blood and his nose bled when he blew his nose. Dkt. 39-2, pp. 21-22. Acetaminophen 325 mg ("Tylenol") was ordered for pain and he was instructed to request a healthcare visit if his symptoms did not improve. Dkt. 39-1, ¶ 8; dkt. 39-2, pp. 21-22. Nurse Briggs also ordered the x-ray that Dr. Byrd had prescribed. *Id.* at p. 23-24.

On October 2, 2015, outside radiologist Robert Mehl, M.D., entered his radiology report of the x-ray of Mr. Mendoza's facial bones. The radiology report reflected no sign of fracture or other abnormality of the maxillofacial bones or orbits. Dkt. 39-2, p. 34; dkt. 39-1, ¶ **8.**

On that same day, Dr. Byrd saw Mr. Mendoza for a provider visit to discuss the x-ray results. Dkt. 39-2, pp. 19-20; dkt. 39-1, ¶ 9. Mr. Mendoza continued to complain of swelling and bruising over the right side of his face. Dr. Byrd advised him that this was expected with the nature of his injury and that the bruising and swelling would take a while to resolve. *Id.* Mr. Mendoza's laceration repair remained in place with no sign of infection. Dr. Byrd advised Mr. Mendoza that his x-ray did not reveal any fracture or other abnormality and that resolution of his pain and swelling should occur over the next several weeks. *Id.*

Dr. Byrd further advised Mr. Mendoza to inform medical staff if his symptoms worsened or if he experienced any neurological issues. Mr. Mendoza told Dr. Byrd that he believed racism was playing a role in the decisions regarding his medical treatment and Dr. Byrd told him that the medical treatment Mr. Mendoza was receiving was no different than what Dr. Byrd would provide to any patient regardless of the offender's status or race. *Id.* Dr. Byrd disputes Mr. Mendoza's statement that during the October 2, 2015 examination**,** Dr. Byrd told him, "don't freak out, but your face is messed up." Dkt. 46-1, p. 33, ¶ 12; dkt. 39-1, ¶ 9.

On October 8, 2015, Mr. Mendoza submitted a HCRF again inquiring about the results of his x-rays and stating that he continued to have headaches and pain around his eye area. Dkt. 39-2, p. 43. On October 11, 2015, Mr. Mendoza was seen by Ashley Swartzentruber, R.N. He was again shown his x-ray results and informed that they were normal. Mr. Mendoza was asked by Nurse Swartzentruber if he had any further questions regarding his treatment. After he responded in the negative, he returned to his housing unit. Dkt. 39-2, pp. 15-18; dkt. 39-1, ¶ 10.

During the days following his October 2, 2015, visit with Dr. Byrd, Mr. Mendoza's pain was greatly relieved because of the pain medication. Dkt. 46-1, p. 20, ¶ 33. Mr. Mendoza states in his declaration that for about two weeks, he still had some pain, headaches, blurred vision, difficulty sleeping and dizzy spells, but then the severe pain and other problems went away. *Id.* at ¶¶ 33-34.

On November 24, 2015, Mr. Mendoza was seen for his annual well encounter examination by Nurse Swartzentruber. No complaints of any residual adverse effects from his September 27, 2015, injury were noted in the well encounter examination. He was found to be free of illness or injury and free of any physical impairment. Dkt. 39-2, pp. 2-12; dkt. 39-1, ¶ 11. Mr. Mendoza did not request or receive any medical care from the date of his annual well

encounter examination on November 24, 2015, through the date he filed his lawsuit on February 11, 2016. Dkt. 39-1, ¶ 12.

There is no evidence in Mr. Mendoza's medical records that he had any further complaints or symptoms regarding his September 27, 2015, facial injury after October 11, 2015. The medical records do not reflect that Mr. Mendoza suffered any long-lasting, adverse effects from his injury. *Id.*

Dr. Byrd opines that even if Mr. Mendoza had suffered a concussion, a concussion is a short loss of normal brain function in response to a head injury. Dkt. 39-1, ¶ 15. Rest is the treatment generally prescribed for a concussion. *Id.* Most concussive traumatic brain injuries are mild, and people usually recover fully with time and rest. *Id.* He cites to http://www.mayoclinic.org/diseases-conditions/concussions as a source for information on concussions. *Id.* The Mayo Clinic website states that "[r]est is the most appropriate way to allow your brain to recover from a concussion." www.mayoclinic.org/diseases-conditions/concussion/diagnosis-treatment/treatment. The Mayo Clinic website also states that for headaches, acetaminophen (Tylenol) may be taken. *Id.*

### B. Analysis

At all times relevant to Mr. Mendoza's claims, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed, but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 8374 (1994); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*); *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011). "A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014).

For purposes of summary judgment, the parties do not dispute the first element, that Mr. Mendoza had a serious medical need.

The subjective element of a deliberate indifference claim "requires more than negligence and it approaches intentional wrongdoing. The Supreme Court has compared the deliberate indifference standard to that of criminal recklessness." *Burton v. Downey,* 805 F.3d 776, 784 (7th Cir. 2015) (internal citation and quotation omitted). To constitute deliberate indifference, "a medical professional's treatment decision must be such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties,* 838 F.3d at 729 (internal quotation omitted).

### *Eighth Amendment Claim Against Nurse Knust*

Mr. Mendoza alleges that Nurse Knust failed to have him sent to an outside provider to receive stitches when she allowed an officer to deny him transportation. He further alleges that she failed to treat him for a concussion and extreme pain, and failed to schedule an appointment with Dr. Byrd the next day.

The last allegation is the easiest to dispose of and will be addressed first. Nurse Knust was not responsible for scheduling doctor appointments, and therefore she was not deliberately indifferent for not setting up an appointment. Nonetheless, she did refer Mr. Mendoza to Dr. Byrd. And, in fact, Mr. Mendoza did see Dr. Byrd the following day. No reasonable jury could find that Nurse Knust acted with deliberate indifference by not scheduling an appointment with the provider.

As to his contention regarding stitches, the fact that Mr. Mendoza did not receive stitches either on site or from an outside provider does not rise to the level of deliberate indifference. "[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible." *Arnett v. Webster,* 658 F.3d 742, 754 (7th Cir. 2011). Rather, "he is entitled to reasonable measures to meet a substantial risk of serious harm." *Id.* The treatment Nurse Knust provided to close the wound with steri-strips was entirely effective. Mr. Mendoza suffered no infection or other complication from the lack of stitches. There is no evidence that stitches were required to allow the wound to heal.

The more significant claim, however, is whether Nurse Knust acted with deliberate indifference when she failed to treat Mr. Mendoza for extreme pain and a possible concussion. Mr. Mendoza and Nurse Knust dispute what he told her when she evaluated his injury on September 27, 2015. Mr. Mendoza states that he told her that he had a severe headache, blurry vision, and he could not see out of his right eye due to swelling. She denies remembering the details of her examination and notes that the medical records do not reflect that Mr. Mendoza reported those symptoms. For purposes of this motion, the Court accepts Mr. Mendoza's statements as true. Nurse Knust states that if a patient reported symptoms such as severe head pain, double vision, or nausea, or other neurological symptoms associated with a possible

concussion, she would have reported those symptoms to the physician on call. Assuming for purposes of this motion that Mr. Mendoza did, in fact, report blurry vision and a severe headache, Nurse Knust did not convey those complaints to Dr. Byrd. In terms of medication, Dr. Byrd only prescribed an antibiotic at the time the nurse called. Dr. Byrd did not prescribe pain medication until approximately 24 hours later when he saw Mr. Mendoza.

Dr. Byrd opined that even if Mr. Mendoza had suffered a concussion, rest is the generally prescribed treatment. The Mayo Clinic website supports Dr. Byrd's opinion, stating that "[r]est is the most appropriate way to allow your brain to recover from a concussion." www.mayoclinic.org/diseases-conditions/concussion/diagnosis-treatment/treatment. The Mayo Clinic website states that for headaches, acetaminophen (Tylenol) may be taken. *Id.* "When medical information can be gleaned from the websites of highly reputable medical centers, it is not imperative that it instead be presented by a testifying witness." *Rowe v. Gibson*, 798 F.3d 622, 628 (7th Cir. 2015) (describing Mayo Clinic website as a "highly reputable medical website[]").

The evidence shows that even if a concussion had been diagnosed within the first day or two of the injury, the recommended treatment would likely not have been any different. That does not account, however, for the fact that no pain medication was prescribed until 24 hours after the injury. Mr. Mendoza's assertions that he suffered from extreme pain with no pain medication during that time are uncontroverted. A reasonable jury could find that when a patient has a cut deep enough to require steri-strips to close the wound and swelling sufficient enough to warrant ice and cool compresses, regardless of what the patient told the nurse, even a lay person would anticipate that these symptoms alone would warrant some type of pain medication.

"A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury *or unnecessarily prolonged his pain,* and even brief, unexplained delays in treatment may constitute deliberate indifference." *Lewis v. McLean*, No. 16-1220, __F.3d__ , 2017 WL 3097864, *5 (7th Cir. July 21, 2017) (internal quotation omitted) (emphasis in original) (one and a half hour delay between learning of painful back condition and taking action could constitute deliberate indifference); *see also Petties,* 836 F.3d at 730 (citing case for proposition that "hours of needless suffering can constitute harm"); *Gomez v. Randle,* 680 F.3d 859, 865 (7th Cir. 2012) ("Delaying treatment may constitute deliberate indifference if such delay exacerbated the injury or unnecessarily prolonged an inmate's pain.") (internal quotation omitted). "Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment." *Perez v. Fenoglio,* 792 F.3d 768, 778 (7th Cir. 2015) (citing *Cooper v. Casey,* 97 F.3d 914, 917 (7th Cir. 1996)("'whether the plaintiffs were in sufficient pain to entitle them to pain medication within the first 48 hours after the beating' presented question for jury")). In *Perez,* one instance of a troubling delay in the plaintiff inmate's treatment was "[a]fter sustaining a gaping wound and open dislocation, he was forced to wait 24 hours before seeing a physician with authority to prescribe medication or suture wounds." *Id.* A reasonable jury could also find that facing similar circumstances, Nurse Knust acted with deliberate indifference by failing to make sure that Mr. Mendoza was provided pain medication before he was sent to his cell for the night. As to the claim against Nurse Knust, the motion for summary judgment, [dkt. 38], is **denied** only with regard to the delay in providing pain medication. In all other respects, the motion for summary judgment, [dkt. 38], brought by Nurse Knust is **granted.**

***Eighth Amendment Claim Against Dr. Byrd***

Mr. Mendoza's claim against Dr. Byrd is that he did not provide appropriate treatment for his injuries until October 2, 2015. He contends that he should have been sent off-site for stitches. This allegation fails for the same reasons discussed in relation to the same claim asserted against Nurse Knust. There is no evidence of record that stitches were required to close the wound. Dr. Byrd examined the wound and noted that "[c]losure is excellent," dkt. 39-2, p. 26, and Mr. Mendoza does not dispute this.

To the extent Mr. Mendoza argues that Dr. Byrd did not treat him for a concussion, the record is undisputed that Dr. Byrd specifically evaluated Mr. Mendoza for signs of a concussion. Moreover, as discussed above, there is no evidence that the treatment protocol would have been different if a concussion were diagnosed the day after the injury. As discussed with regard to the claim against Nurse Knust, the Mayo Clinic website supports Dr. Byrd's opinion that rest is the most appropriate treatment for a concussion. Mr. Mendoza's severe symptoms resolved within a couple of weeks, as Dr. Byrd predicted.

Although Mr. Mendoza would have preferred being sent to an outside hospital for treatment, "mere disagreement with a doctor's medical judgment is not enough to support an Eighth Amendment violation." *Cesal v. Moats,* 851 F.3d 714, 722 (7th Cir. 2017) (internal quotation omitted). There is no evidence that outside treatment was necessary. Dr. Byrd was responsive to Mr. Mendoza's complaints of pain. Dr. Byrd prescribed pain medication, which was effective, and ordered an x-ray, which revealed no fracture.

The Court notes that in the Entry of August 15, 2016, the Court denied Mr. Mendoza's motion for examination under Rule 35 of the *Federal Rules of Civil Procedure.* Mr. Mendoza's request did not fall within the scope of Rule 35. Dkt. 33. Even taking a broader view of the issue

of medical experts, the medical condition at issue, a possible concussion, and the plaintiff's own medical history and reported symptoms are sufficient to provide a fair record in determining whether Dr. Byrd was deliberately indifferent. In other words, Mr. Mendoza's medical claim is not sufficiently complicated to require an independent medical expert.

No reasonable jury could find that Dr. Byrd's actions were "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that [he] actually did not base the decisions on such a judgment." *Jackson v. Kotter,* 541 F.3d 688, 697 (7th Cir. 2008). "A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances." *Id*. at 698 (internal quotation omitted). Accordingly, as to the claim against Dr. Byrd, the motion for summary judgment, [dkt. 38], is **granted.**

## IV. Conclusion

Defendant Dr. Byrd is entitled to summary judgment on Mr. Mendoza's claims of deliberate indifference. Defendant Nurse Knust is entitled to summary judgment on all claims against her *except* that she delayed making sure that Mr. Mendoza was provided pain medication on the date of his injury. Accordingly, the defendants' motion for summary judgment, [dkt. 38], is **granted in part and denied in part.** No partial final judgment shall issue at this time.

The Magistrate Judge is requested to set this matter for a status conference and settlement conference in an effort to resolve the remaining claim against Nurse Knust.

**IT IS SO ORDERED.**

Date: 8/8/2017

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Distribution:

Efren Mendoza-Vargas, DOC #223858
Wabash Valley Correctional Facility
Electronic Service Participant – Court Only

Electronically registered counsel

Magistrate Judge Mark J. Dinsmore